IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | : : : | CIVIL ACTION |
| v. | : : | |
| UNITEK, USA, LLC. | : | NO. 08-4592 |

# MEMORANDUM

**L. Felipe Restrepo**                                                            **September 15, 2010**
**United States Magistrate Judge**

      Plaintiff, Equal Employment Opportunity Commonssion ("EEOC"), initiated this employment discrimination action against defendant, Unitek, USA, LLC ("Unitek"), alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. Specifically, Plaintiff alleges that defendant failed to hire Frank J. Bruno ("Bruno"), then age 54, on the basis of his age.

      Testimony was heard at a bench trial before this Court from April 19, 2010 through April 21, 2010. Counsel for each party subsequently filed their respective Proposed Findings of Fact and Conclusions of Law (herein referred to as the parties' briefs), and a joint statement of undisputed facts. For the reasons set forth below, judgment is awarded in favor of defendant and against plaintiff.

### 1. Findings of Fact

      Defendant Unitek was founded in June 2004. See Joint Statement of Undisputed Facts (hereinafter "Jt. St."), ¶ 2. The company provides engineering and construction of fiber optic cable for telecommunications companies, and installs set-up converters and residential

equipment for cable and satellite companies. See Parties' Joint Stipulation (hereinafter "Stip."), ¶ 4. Scott Hisey ("Hisey") served as president and Chief Executive Officer ("CEO") of the company from inception through July 2008, at which time he ceded the position of president to Peter Giacalone. Stip. ¶ 5; Jt. St. ¶ 15. Mike Hisey ("M. Hisey"), Scott Hisey's brother, served as interim Human Resource ("HR") Director and Operations Manager during the time period at issue. Jt. St. ¶ 10. Greg Sudell ("Sudel") was Unitek's Chief Financial Officer at the time. Trial Tr., 80:2-12, Apr. 20, 2010. Joseph Kestenbaum ("Kestenbaum") was one of two initial investors in Unitek and became the majority shareholder of Unitek at some time in 2006. See Kestenbaum Dep. 9:6-11:7, May 19, 2009;[1] Trial Tr., 38:14-17, Apr. 21, 2010 (Hisey identifying Kestenbaum as a private equity sponsor of Unitek). Dr. Victoria Green ("Green") was retained by Unitek to perform management consulting, including executive coaching and executive hire interviewing. Jt. St. ¶ 16; see also Trial Tr., 13:8-16, Apr. 21, 2010 (Green testified that she was asked to interview candidates for the HR Manager position and to provide feedback to Scott Hisey.).

In 2006, Unitek followed a standard protocol when interviewing for positions that would pay $75,000 or more. First, candidates would meet with Sudell and Hisey. Trial Tr., 130:2-14, Apr. 20, 2010 (Elizabeth Downey ("Downey") experience); Trial Tr., 238:10-14, Apr. 19, 2010 (Douglas Forde experience). Further interviews would occur with other members of senior management, including M. Hisey. Trial Tr., 41:1-7, Apr. 21, 2010. If an individual had been deemed a likely candidate for the position, that individual would then meet with Green and

---

[1] Kestenbaum was not available for trial, and so the Court, by the agreement of counsel for both parties, accepted and read the entirety of Kestenbaum's deposition transcript. See Trial Tr., 172:18-174:12, Apr. 20, 2010. The Court similarly accepted and read the entirety of Peter Giacalone's deposition transcript. See Trial Tr., 37:3-15, Apr. 21, 2010.

2

Kestenbaum. Jt. St. ¶ 17; see also Trial Tr., 81:15-82:8 (Sudell), 131:17-132:2 (Downey), Apr. 20, 2010. Hisey ultimately made the decision whether to hire an individual for the posted position. Trial Tr., 42:5-13, Apr. 21, 2010; Trial Tr., 195:16-18, 205:2-4, 205:21-25, Apr. 19, 2010. In making his decisions, Hisey relied upon the input from all the people who conducted interviews. Trial Tr., 42:5-13, Apr. 21, 2010; see also List of Decision Makers, attached as Ex. 5 to Unitek Position Statement, Ex. P-4. As a general matter, Kestenbaum deferred to Hisey on all business decisions dealing with personnel and contracts. Trial Tr., 63:6-11, Apr. 21, 2010; see Kestenbaum Dep., 12:10-14, May 19, 2009 (asserting he always told management to hire or not hire individuals he met with as they saw fit).

In February 2006, Unitek posted a job opening for the position of HR Manager on the website www.monster.com. See Job Posting, Ex. J-1; Stip ¶ 9. Pursuant to the job description, Unitek sought an individual who had seven to ten years of experience in the Human Resources field, who would document policies and procedures and assure adherence to them, who would be expected to track and ensure development plans for employees were being met, who could help in developing strategic business initiatives, and who could demonstrate strong sourcing, interviewing, and people planning skills. Id. Unitek was seeking an individual who exhibited a combination of skill, experience, cultural fit with the company, and the ability to scale and grow with the business. Stip ¶ 6. Further, the company was looking for an individual who could implement a systematic performance tracking model to measure performance. See Trial Tr., 133:11-25, Apr. 20, 2010 (Downey testifying about what Sudell described job requirements); Trial Tr., 83:5-14, Apr. 19, 2010 (Bruno testifying about what he noted Hisey stated the company was looking for).

On April 5, 2006, Bruno submitted his resume for the position of "Manager of Human Resources" at Unitek. See Cover Letter, Ex. J-2. Though Bruno submitted his resume and cover letter via monster.com, see Trial Tr., 56:24-57:6, Apr. 19, 2010, he also knew people connected socially with Scott Hisey, notably Bill Lucchesi, who recommended that Hisey meet with Bruno about the open HR position. See id. 65:7-18 (Bruno); see also Trial Tr., 42:14-5, Apr. 21, 2010. At the time he submitted his resume for this position, Bruno was fifty-four (54) years old. Trial Tr., 37:24, Apr. 19, 2010. Bruno had a Bachelor's Degree in Psychology from Trenton State College, and had his MBA from Temple University. Trial Tr., 39:9-12, Apr. 19, 2010. Bruno's resume indicated that he had approximately twenty-five (25) years of experience in the human resources field, Jt. St. ¶ 18, having held positions at Sermatech International (twelve years), Technitrol, Inc. (two years), Covance, Inc. (two years), Garden State Tanning, Inc. (eight years), and Henkels & McCoy (approximately a year). See Bruno Resume, Ex. J-2. Bruno testified that while at Sermatech, he drafted the company's internal HR policies, negotiated labor contracts, and gathered information for senior management about potential HR costs associated with proposed mergers. See Trial Tr., 42:13-44:22, Apr. 19, 2010.[2] At Technitrol, Inc., he served as the Director of Human Resources, and in that capacity he consolidated the benefit plans across multiple production facilities, initiated a succession plan for manager development, and participated in team training exercises. See Trial Tr., 44:23-47:23, Apr. 19, 2010. He then did outplacement and recruiting work, in addition to policy drafting and establishment, at Covance, Inc. See Trial Tr., 47:24-51:4, Apr. 19, 2010. At his next employer, Garden State Tanning, Bruno managed union negotiations, was responsible for labor contracts, and participated in the

---

[2] Mr. Bruno did not describe his alleged experience at Sermatech of "pilot[ing] the company through two due diligence for acquisitions" to any interviewer at Unitek. Trial Tr., 126:4-19, Apr. 19, 2010.

due diligence efforts that occurred prior to the business being sold to a venture capital firm. See Trial Tr., 51:4-54:5, Apr. 19, 2010. Bruno then worked at Henkels & McCoy, a telecommunications company, at which he managed labor relations and reduced the cost of healthcare.[3] See Trial Tr., 54:7-56:12, Apr. 19, 2010.

Ms. Elizabeth Downey ("Downey") also submitted her resume for this position in early April 2006. Apr. 20, 2010 Tr. at 127:2-9. At the time she applied for the job, Ms. Downey was thirty-six (36) years old. Stip. ¶ 20. Ms. Downey has a Bachelor's Degree in Communications from Pennsylvania State University and an MBA from the University of Phoenix. See Downey Resume, Ex. J-6. She also holds the designation of Senior Professional of Human Resources from the Society of Human Resource Management. Trial Tr., 123:17-124:1, Apr. 20, 2010. Ms. Downey's resume indicated that she had between eleven and fourteen years of relevant experience, including human resource positions at Lightship Telecom (four and half years), Capsule Communications (one year), Current Medicine (four years), and The Richardson Group (two years). Id.; see also Jt. St. ¶ 8. While Ms. Downey was at Lightship Telecom, a company similar to Unitek, the company was in an "entrepreneurial mode" and going through "a growth phase," at which point she worked on implementing reporting metrics for the company. Trial Tr., 135:7-19, Apr. 20, 2010.

Both Bruno and Downey were selected by Unitek to interview for the position of Human Resource Manager in April 2006.[4] Their respective interviews occurred throughout that month.

---

[3] Although he described Henkels & McCoy as a telecommunications company, Bruno testified in his deposition that he never worked in the telecom field. Trial Tr., 208:15-209:4, Apr. 19, 2010.

[4] Unitek had already interviewed and decided not to hire Douglas Forde ("Forde") for the HR Manager position in March, 2006. Pl. Br. ¶¶ 84-96. Forde testified that at his interview, he met with Sudell and Hisey in a conference room, during which time they discussed working with spreadsheets and policy development. Trial Tr., 237:14-19, 238:10-14, Apr. 19, 2010. Though no specific age-related comment was made by any of the men conducting his

5

On April 12, 2006, Bruno had his first Unitek interview with Sudell. Trial Tr., 58:25-59:1, Apr. 19, 2010. Sudell testified that Bruno's resume indicated he was qualified for the HR manager position. Trial Tr., 95:3-6, Apr. 20, 2010. Bruno did not recall being asked any questions at the interview about his ability to perform matrices or spreadsheets, but instead recalled describing his past experiences, his ability to draft policies, his ability to make charts, and his general capacity to "roll up his sleeves" to get a job done. See Trial Tr., 59:4-62:13, Apr. 19, 2010. Bruno also brought up the names of three individuals to see if he and Sudell knew people in common. Id. at 135:14-140:4. Sudell never asked Mr. Bruno his age. Id. at 124:14-16, 125:5-7. Sudell testified that Mr. Bruno was not a good fit for the company, stating that it was his impression at the time that Bruno would delegate responsibilities instead of taking on tasks himself. See Trial Tr., 84:24-86:6, Apr. 20, 2010. However, he could not specifically identify what might have led him to that conclusion, only that he remembered having that impression at the time. Id. at 100:14-23.

On April 14, 2006, Bruno next interviewed with Hisey at a bagel shop early in the morning.[5] Hisey had heard about Bruno from a mutual acquaintance they shared, and at the bagel store they discussed people they knew in common. See Trial Tr., 65:7-18, Apr. 19, 2010 (Bruno); Trial Tr., 42:14-43:5, Apr. 21, 2010 (Hisey). Discussing his professional capacity at this interview, Bruno again emphasized his ability to draft policies and his experience in managing the HR function. Bruno and Hisey did not discuss Bruno's experience, if any, in

---

interview, Id. at 249:21-24, Forde felt that the interviewers were implying that he might not be able to do the job because of his age, fifty-eight, at the time of the interview. Id. at 241:15, 244:1-10. Forde stated that a change in the "temperature" of the interview occurred after a salary of $130,000 was discussed. Id. at 252:8-26.

[5] Hisey believed that Bruno's first interview with Unitek was when he and Bruno met at the bagel store, but indicated that his understanding could be incorrect. See Trial Tr., 86:5-16, Apr. 21, 2010.

6

mergers and acquisitions or "charts or graphs." See Trial Tr., 63:10-68:25, Apr. 19, 2010. During the interview, Hisey indicated that he was interviewing other candidates. Id. at 150:25-151:9. At no point did Hisey ask Bruno his age. Id. at 145:5-8. Bruno testified that, after this meeting, he understood that Hisey controlled the decision to hire for the HR Manager position. Id. at 162:2-7.

By April 17, 2006, Downey had completed at least her first interview. See Trial Tr., 129:5-19, Apr. 20, 2010; Ex. J-6. At her first interview, Downey met with Hisey and Sudell in a conference room at Unitek. Jt. St. ¶ 10; see Trial Tr., 130:2-14, Apr. 20, 2010. Sudell emphasized that the company was looking for an individual who could put a systematic performance tracking system in place, as the company at that time did not have metrics in place to measure performance. See Trial Tr., 133:11-25, Apr. 20, 2010. Hisey and Sudell also focused their questions on Ms. Downey's experiences during the sale of Lightship Telecom, focusing on the sale and merger process in which she participated. Id. at 136:12-18. Although Hisey felt that Downey interviewed very strongly when they first met, he adhered to the Unitek hiring process and determined that she had to go through the entire Unitek committee hiring process before any hiring decision could be made. Trial Tr., 56:20-58:6, Apr. 21, 2010.

Downey's second interview was with Mike Hisey. She could not recall when this interview occurred. Mike Hisey led a conversational interview, although he focused on her experience with mergers and acquisitions. Trial Tr., 142:22-144:22, Apr. 20, 2010.

On April 18, 2006, Bruno had his third interview at Unitek, this time a lunch interview with Mike Hisey, at which Bruno talked about his experience drafting policies. See Trial Tr.,

7

72:8 - 78:19, Apr. 19, 2010. Bruno testified that Mike Hisey indicated he would recommend that Mr. Bruno be offered the job. Id. at 78:3-15.

On April 20, 2006, Bruno was scheduled to meet with Kestenbaum. Stip. ¶¶ 15, 16. Bruno met with Hisey in advance of this meeting, and Hisey told Bruno that the meeting with Kestenbaum would be more informal. Trial Tr., 45:3-46:14, Apr. 21, 2010. In preparing Bruno with talking points that Kestenbaum would likely want to hear, Hisey also told Bruno that Unitek was looking for an individual in HR who could systematically measure employees' performance as compared to their pay and who could perform a compliance audit. See Trial Tr., 78:22 - 85:18, Apr. 19, 2010. Bruno testified that Hisey told him he thought Bruno was a strong candidate, although he did not indicate he was the only candidate. Id. at 151:20-152:10; Apr. 21, 2010 Tr. at 74:7-75:6 (Hisey's recollection). Towards the end of this meeting, Bruno also met with Green. Trial Tr., 86:17-89:8, Apr. 19, 2010; Trial Tr., 16:3-12, Apr. 21, 2010. Hisey was present for some of Bruno's meeting with Green. Trial Tr., 45:8-46:4, Apr. 21, 2010; but see Trial Tr., 86:5-15, Apr. 19, 2010 (Bruno testifying that Hisey was present for the entire conversation with Green); Trial Tr., 16:14-20, Apr. 21, 2010 (Green testifying that Hisey left the room after initial pleasantries were exchanged).[6] Green asked Bruno about an experience in which he had made a change to an organization he worked for. See Trial Tr., 86:21-25, Apr. 19,

---

[6] While Green estimated that her meeting with Bruno took between thirty and forty-five minutes, Bruno's testimony indicates that the meeting was no longer than ten minutes, as he interacted with her prior to his early departure to arrive to Kestenbaum's office in a timely manner. See Trial Tr., 85:5-89:8, Apr. 19, 2010. Bruno testified that he heard Green state she was at Unitek for "coaching," Trial Tr., 85:12-18, Apr. 19, 2010, and an invoice indicates she billed that day for "Development." 4/30/06 Invoice, Ex. J-4. As there is no documentation that Green charged for assessing candidates on April 20, 2006, but that she was at the facility on that date, see 4/30/06 Invoice, Ex. J-4, it is reasonable to conclude that she did indeed have a short meeting with Bruno, and did not charge for that amount of time as she was already otherwise employed at Unitek on April 20, 2006. Green does not have any documentation that would corroborate that she interviewed Bruno, as she left her prior job and did not take her Outlook calendar with her. See Trial Tr., 31:10-32:12, Apr. 21, 2010. Further, Green testified that she takes notes in interviews when she thinks a candidate could be effective in the organization so that she remembers what caused that impression. Id. at 20:12-18. Since Bruno was not impressive, she did not take notes. See id.

8

2010. In response to her question, Bruno described changing a benefits structure at a prior employer. Id. at 86:17-89:8. Both Hisey and Green described Bruno as struggling with answering Green's question about implementing a change at a prior employer. Trial Tr., 17:1-24, 46:15-47:7, Apr. 21, 2010. Hisey testified that his opinion about Bruno began to change upon observing Bruno and Green's interaction. Id. at 48:6-19, 75:7-76:9. Immediately upon Bruno's departure, Green informed Hisey of her impression that Bruno would not be effective in the HR Manager role. Id. at 18:20-19:3. After the short meeting with Green, Bruno drove to Kestenbaum's office. Trial Tr., 87:17-88:2, Apr. 19, 2010. Unbeknownst to Bruno, Green immediately recommended to Hisey that he not hire Bruno. Trial Tr., 18:25- 19:3, Apr. 21, 2010.

Bruno then went to meet with Kestenbaum. After some casual conversation, including a brief discussion about the Flyers, Kestenbaum asked Bruno to describe his work experience. Trial Tr., 91:3-93:3, Apr. 19, 2010. Bruno started describing his post-collegiate job history. Id. About halfway through the interview, see id. at 103:10-105:15, after Bruno talked through a variety of his work experiences and his work history, Kestenbaum started to look confused, see id. at 214:4-215:14, and queried, "What are you, 78?" See id. at 91:3-93:3 (Frank Bruno); Trial Tr., 22:12-22, Apr. 20, 2010 (Karen McCabe);[7] id. at 113:15-115:23 (Rudolph White). Bruno responded that he was fifty-five. Trial Tr., 91:3-93:3, Apr. 19, 2010. Bruno testified that he then told Mr. Kestenbaum about Unitek's interest in executing a pay-for-performance analysis, something he testified that "Scott would've wanted [him] to interject at that interview." Id. at

---

[7] Karen McCabe was the EEOC investigator assigned to investigate the charge in Bruno v. Unitek. Trial Tr., 4:22-5:19, Apr. 20, 2010. As a part of her investigation, she conducted a fact-finding conference during which she interviewed various individuals from Unitek. Id. at 13:9-23. As a part of this conference, she interviewed Kestenbaum, and during trial she testified as to what Kestenbaum told her during this interview. Id. at 21:23-22:22.

9

94:15-95:3. Kestenbaum did not ask Bruno specific questions about his telecommuncations experience, his experience with mergers and acquisitions, or his ability to work with spreadsheets and matrices. Id. at 96:4 - 12. At the end of the interview, Kestenbaum escorted Bruno to the elevator, put his arm around him, and told Bruno that he was a qualified candidate. Id. at 174:16-23. Although Kestenbaum relayed to Hisey that he thought Bruno was a "nice guy," Trial Tr., 55:12-21, Apr. 21, 2010, Kestenbaum also stated he had a "gut feeling" that Bruno was not a "good fit" for the company, Trial Tr., 22:4-11, Apr. 20, 2010 (Karen McCabe), and that he did not believe that Bruno would successfully perform the responsibilities of the HR Manager position. See Position Statement, Ex. P-4, at p. 4. However, Kestenbaum stated repeatedly that he never told Hisey not to hire somebody, but instead noted that management should hire or not hire as they saw fit, consistent with the interview process in place. See, e.g., Kestenbaum Dep., 12:10-14, 15:20-16:5, 18:11-19, May 19, 2009.

Although it is not clear from the testimony whether Downey's first interview occurred on April 17, 2006, or whether her second interview was on that date, see Trial Tr., 129:5-19, Apr. 20, 2010; Ex. J-6, it is clear that Downey met at least with Hisey and Sudell in the midst of Bruno's series of interviews. Sudell testified that he felt that Downey was a good candidate who would be successful in the position. Trial Tr., 84:24-86:6, Apr. 20, 2010. Sudell did not recall discussing performance metrics with Bruno, but recalled speaking about performance evaluation with Downey. Id. at 92:8-15. Similarly, Hisey thought Downey interviewed very strongly when they first met. Trial Tr., 56:20-58:6, Apr. 21, 2010.

On April 21, 2006, Bruno emailed Hisey to inquire about feedback from his meeting with Kestenbaum. Email, Ex. J-3. In response, Hisey called Bruno and told Bruno that he was no

longer the top candidate (he was not told that he was out of consideration). Trial Tr., 191:14-192:13, Apr. 19, 2010. Bruno emailed Hisey the next day, again asking "what changed [his] mind from the time [they] spoke Thursday morning to Friday afternoon." Apr. 22, 2006 Email, Ex. J-3. Hisey responded to this email, reiterating that Unitek was always clear there were other candidates for the position, and that one of these candidates emerged ahead. Hisey indicated his phone call was an attempt to set Bruno's "expectations to aggressively pursue other opportunities." Apr. 22, 2006 Email, Ex. J-3.

On April 26, 2006, shortly after his email exchange with Hisey, Bruno filed an ADEA charge of discrimination with the EEOC against Unitek. Stip. ¶ 23.

On April 28, 2006, Ms. Downey interviewed with Dr. Green. Stip. ¶ 20. Downey described her meeting with Green as being focused on what type of environment she thrives in and what "culture" she can work in. Trial Tr., 151:19-152:15, Apr. 20, 2010. She later interviewed with both Kestenbaum and Dan Yannantuono. Id. at 145:4-8, 152:16-22. As did Bruno's interview, Downey's interview with Kestenbaum occurred in his office and started with a short discussion of the Flyers. Kestenbaum read down her resume and instructed her to discuss each of her positions. He was focused on financials and metrics. He indicated that he would provide input on candidates. Id. at 145:18-146:17, 147:15-148:6. On June 1, 2006, Unitek offered Ms. Downey the position of HR Manager, which she accepted. Stip. ¶ 21.

On or around July 20, 2006, Mr. Bruno was offered a job with SPS Technologies, a job he accepted on July 26, 2006. Stip. ¶ 25.

11

## 2. Conclusions of Law

As explained above, Plaintiff contends that in selecting Ms. Downey for the position of HR Manager instead of Mr. Bruno, Defendant engaged in age discrimination under the ADEA. The parties acknowledge that claims under the ADEA are analyzed under the burden-shifting framework established in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Def. Br. at 17-18; Pl. Br. at 22; see also Waris v. Heartland Home Healthcare Serv., Inc., 365 Fed. Appx. 402, 404 (3d Cir. Feb. 17, 2010) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003)).

Under McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination. See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). To do so, a plaintiff must demonstrate that: (1) plaintiff is at least forty years of age or older; (2) he applied and was qualified for a job the employer was trying to fill; (3) though qualified, he was rejected; and (4) the rejected applicant was replaced by an individual sufficiently younger to support an inference of discriminatory animus. Smith v. City of Allentown, 589 F.3d 684, 689-90 (3d Cir. 2009) (noting that the Circuit's continued adherence to the McDonnell Douglas burden-shifting analysis is not inconsistent with the Supreme Court's reiteration in Gross v. FBL Financial Serv., Inc., 129 S. Ct. 2343 (2009), that the plaintiff in an ADEA case must prove by a preponderance of the evidence that age was the "but for" cause of an adverse employment action). Here, as acknowledged by the parties, Plaintiff has made out a prima facie case of age discrimination. See Trial Tr., 91:13-92:1, Apr. 21, 2010. Bruno was fifty-four years of age when he applied for the job. Trial Tr., 37:24, Apr. 19, 2010. Per the experience identified on his resume, Bruno was qualified for the HR Manager position. See, e.g., Trial Tr., 95:3-6, Apr. 20, 2010. Bruno was

not hired for the position of HR Manager, as Defendant ultimately hired Downey, who is approximately eighteen years younger than Bruno. See June 1, 2006 Offer Letter, Ex. J-7.

Since a prima facie case of age discrimination has been made, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for not selecting Bruno for the position. See Barber v. Univ. of Med. and Dentistry of N.J., 118 Fed. Appx. 588, 590 (3d Cir. Dec. 15, 2004) (quoting Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)). Defendant's relatively light burden at this step requires Defendant to introduce evidence that permits the conclusion that it had a nondiscriminatory reason for failing to hire the individual of the protected class. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

The job posting on monster.com described certain elements of what Defendant sought, notably Unitek sought an individual who had seven to ten years of experience in the Human Resources field, who would document policies and procedures and assure adherence to them, who would be expected to track and ensure development plans for employees were being met, who could help in developing strategic business initiatives, and who could demonstrate strong sourcing, interviewing, and people planning skills. See Ex. J-1. Both candidates had been in the field of human resources for at least that long. As articulated to Bruno before he went to meet with Kestenbaum, Defendant sought an individual who had familiarity with and who could implement company-wide employee productivity tracking models in order to measure employees' performance as compared to their pay. See Trial Tr., 78:22 - 85:18, Apr. 19, 2010. Finally, Defendant sought an individual who would thrive in the company culture. Defendant concluded that Downey demonstrated the qualities it sought more than Bruno. Defendant further argues that while Scott Hisey considered the input of Dr. Victoria Green, Joseph Kestenbaum,

and the other individuals who interviewed the applicants, Hisey was the ultimate decision maker as to whom Unitek would hire. These individuals credibly testified that they found Downey to be the stronger candidate for the position, notwithstanding Bruno's longer term of general human resource department experience.

As Defendant sufficiently articulated nondiscriminatory reasons for deciding to hire Downey instead of Bruno, see Pl. Br. at 24, ¶ 9, the burden shifts back to Plaintiff to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir.2005). Proving pretext "places a difficult burden on the plaintiff," id. (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994)), and is a fact-based inquiry. See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998). To successfully demonstrate pretext, a plaintiff:

> must submit evidence which [either] (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

Fuentes, 32 F.3d at 762. To satisfy the first prong for establishing pretext, Plaintiff must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. at 765 (citations omitted). In the alternative, to satisfy the second prong Plaintiff must show that but for Bruno's age, he would have been hired as the HR Manager at Unitek. See Smith, 589 F.3d at 691; see also Pl. Br. at 21, ¶ 2; Def. Br at 17, ¶ 2.

Plaintiff contends that Defendant's arguments are pretextual because Bruno was moving

14

quickly through the interview process until he met with Kestenbaum, at which point the dynamic of the process changed. Pl. Br. at 25, ¶ 13. To support its argument that Defendant's explanations are pretextual, Plaintiff then identifies several points that it argues are inconsistent. First, Plaintiff argues that the reasons proffered by Defendant for denying Bruno the position changed from the 2006 position statement (Kestenbaum and Green thought he would not perform well), to the 2008 fact-finding conference (inconsistent identification of decision makers), and finally to the 2009 deposition of Kestenbaum (stating he approved of all candidates at deposition when he stated he did not approve of Bruno at the 2008 conference). Pl. Br. at 25-26, ¶ 14. Plaintiff also argues Kestenbaum played a decisive role in the hiring process and his comment demonstrated age bias. Id. at 26-27, ¶ 15. Plaintiff further contends that the extent to which Defendant claimed it relied on Green's opinion changed over time, demonstrating inconsistencies between stories. In addition, Plaintiff identifies the discrepancy in documentation between Green's interviews with Bruno and Downey (no notes and no billing record for the former, and notes allegedly taken and a line item on an invoice for the other) as showing Green's purported opinion about Bruno is not credible. Id. at 27-28, ¶ 16. Finally, Plaintiff argues that Bruno was well-qualified for the HR position. Id. at 30-31, ¶ 23.

Plaintiff does not persuade by a preponderance of the evidence that Defendant's asserted reasons for deciding not to hire Frank Bruno are pretextual or that age discrimination was the "but for" cause of Defendant's hiring decision.

As for the timing in the change of the tenor of the interviews that Plaintiff alleges shows the impact of Kestenbaum's allegedly ageist comment on Bruno's prospects, Plaintiff does not address the fact that Downey had at least one, if not two, interviews before Bruno's meetings

15

with Green and Kestenbaum. Hisey and Sudell testified credibly that they were very impressed with Downey after their first meeting with her, that she was able to discuss methods for tracking employee performance, and that she was versed in the issues that an HR department would have to address in a merger or acquisition situation. All of this occurred prior to Bruno's meeting with Kestenbaum. That Hisey ultimately stated to Bruno that "another candidate has come ahead in the process" comports with this order of events.

Whether or not Defendant hired Green to conduct an interview of Bruno, it is clear they met for some period of time the morning of April 20, 2006. Green testified credibly that she very quickly concluded Bruno was not a good fit for the company, an opinion that Hisey came to share as he observed Bruno's poor performance in responding to Green's question. Although testimony by Bruno, Green, and Hisey differed as to the amount of time Green and Bruno met and the amount of time Hisey spent with the two of them, they all testified that Hisey spent some time with Green and Bruno, and that Green asked Bruno at least one substantive question. Hisey testified credibly that he became less certain of the strength of Bruno's candidacy after observing Bruno's interaction with Green. Green credibly testified that she provided her feedback to Hisey immediately after Bruno left, before Bruno even met with Kestenbaum. Plaintiff does not point to information that shows Hisey's explanation of his changing opinion regarding Bruno's candidacy is in any way pretextual.

Regarding the identification of the individual who ultimately made the decision, even Bruno testified that it was his understanding that Hisey had ultimate decision-making authority for the hiring process. Hisey testified credibly that Unitek had a process in place through which individuals who applied for positions that paid a salary of at least $75,000 were interviewed.

Hisey testified that while he consulted all the individuals who interviewed candidates, he made the final personnel choices. Both Hisey and Kestenbaum testified that Kestenbaum deferred to Hisey's decisions, although Hisey canvassed his opinion as one of several. The general process by which interviews were conducted as described by Hisey was executed with reasonable consistency for each of the identified applicants for the period in which they remained viable candidates.

As discussed above, the alleged inconsistencies identified by Plaintiff are not so substantive that they can establish the reasons articulated by Defendant for opting not to hire Bruno are a pretext for unlawful discrimination. See Barber, 118 Fed. Appx. at 590 (citing Jones, 198 F.3d at 410).

Further, the credible evidence does not indicate that but for Bruno's age, Defendant would have hired him. See Smith, 589 F.3d at 692. Plaintiff has not established that Bruno was a superior or even equivalent candidate for the position such that Plaintiff has shown Bruno's age was the but for cause of Defendant's decision not to hire him. Downey's experience, while fewer in years than that of Bruno, was directly relevant to the needs of the company. Her prior employer was substantially similar to Defendant and while there she implemented systems that Defendant articulated it needed to both candidates. Plaintiff did not show that Bruno had a similarly compelling resume for the specific needs of Defendant.

Based on the credible evidence, Defendant did not discriminate against Frank Bruno when he was not selected for the position of HR Manager. The hiring decision was not discriminatory against Bruno in violation of the ADEA. Accordingly, defendant is entitled to judgment in its favor.

An implementing order follows.